**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**(WATERLOO)**

|  |  |
|---|---|
| **IN RE:**<br><br>**RYAN'S ELECTRICAL SERVICES, LLC,**<br><br>Debtor. | Case No. 20-00411<br><br>Chapter 11<br><br>Hon. Thad J. Collins |

**PLAN OF REORGANIZATION**

Dated: June 23, 2020

RESPECTFULLY SUBMITTED,

*/s/ Robert C. Gainer*
Robert C. Gainer        AT0000305
CUTLER LAW FIRM, P.C.
1307 50th Street
West Des Moines, IA 50266
Tel:  515-223-6600
Fax: 515-223-6787
Email:  rgainer@cutlerfirm.com
ATTORNEY FOR DEBTOR

# Table of Contents

ARTICLE I:  INTRODUCTION .................................................................................................. 3

ARTICLE II - GENERAL PROVISIONS ................................................................................. 5

ARTICLE III - BACKGROUND ............................................................................................... 5

ARTICLE IV - THE PLAN OF REORGANIZATIONAND TREATMENT OF CLAIMS AND EQUITY INTERESTS.......................................................................................................... 8

    1. Class 1: Priority Claims. .................................................................................................... 11

    2. Class 2: Secured Claim of the Department of Treasury – Internal Revenue Service.......................................... 11

    3.  Class 3: Secured Claim of Community State Bank. ................................................................. 11

    4.  Class 4: Secured Claim of AmeriCredit Financial Services dba GM Financial. ............................. 11

    5.  Class 5: Secured Claim of Ally Bank. ................................................................................. 12

    6. Class 6: General Unsecured Creditors. ................................................................................ 12

    7. Class 7: Equity Interests in the Debtor ................................................................................ 12

ARTICLE V – DISTRIBUTIONS............................................................................................ 12

ARTICLE VI - ALLOWANCE AND DISALLOWANCE OF CLAIMS ................................. 13

ARTICLE VII - PROVISIONS ON EXECUTORY CONTRACTS/UNEXPIRED LEASES .... 13

ARTICLE VIII - MEANS OF IMPLEMENTING THE PLAN.................................................. 14

ARTICLE IX – CERTAIN FEDERAL INCOME TAX INFORMATION ................................ 14

AND CONSEQUENCES ........................................................................................................ 14

ARTICLE X - CONFIRMATION REQUIREMENTS AND PROCEDURES .......................... 15

ARTICLE XI- EVENTS OF DEFAULT .................................................................................. 17

ARTICLE XII - EFFECT OF CONFIRMATION OF PLAN .................................................... 17

ARTICLE XIII – REQUEST FOR CONFIRMATION ............................................................ 19

# ARTICLE I:  INTRODUCTION

**RYAN'S ELECTRICAL SERVICES, LLC,** (hereafter, Debtor or Debtor in Possession) proposes this Plan of Reorganization in regard to its operations and continuation in business.  The Plan contemplates a restructuring of secured and unsecured obligations, as outlined hereafter. This Plan is filed under Subchapter V of Title 11 of the United States Code, and proposes to pay the Debtor's Creditors from monies that the Debtor has accumulated during its Chapter 11 case and funds from the Debtor's future income.  The Debtor will continue to remain in possession of all property of the Estate pursuant to §1186.

This Plan provides for two (2) Classes of Allowed Secured Claims and four (4) Classes of other Claims and interests. This Plan provides for the payment of Allowed Administrative Expense Claims, Secured Claims, Priority Claims, and Unsecured Priority Tax Claims in full (by balloon payment). The Debtor estimates that Creditors holding Allowed General Unsecured Claims will receive distributions totaling at least eleven cents on the dollar over a five (5) year period after the Petition Date.

Creditors should refer to Article IV of this Plan for information on the treatment of their particular Claims.  This Plan provides detailed information regarding the terms for payment of the Debtor's Creditors and other information designed to assist Creditors in determining whether to accept the Plan. The information in this Plan was provided by the Debtor and has not been audited, compiled, or otherwise reviewed by any third party. The Debtor specifically disclaims any liability for unintentional errors and inadvertent inaccuracies contained in this Plan.

**YOUR RIGHTS MAY BE AFFECTED. YOU SHOULD READ THESE PAPERS CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY, IF YOU HAVE ONE. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE TO DETERMINE AND EVALUATE YOUR RIGHTS UNDER THIS PLAN.**

## A. Purpose of This Document

This Plan, in conformance with 11 U.S.C. § 1190, describes:

- A brief history of the business operations of the Debtor, and historical information regarding the events leading to the Bankruptcy Case, and
- A liquidation analysis, and
- Projections with respect to the ability of the Debtor to make payments under the Plan, and

- Significant events during the bankruptcy case
- How the Plan proposes to treat Claims of the type you hold, i.e., what you will receive on your Claim if the Plan is confirmed and how issues on the allowance of Claims will be addressed,
- How the Debtor will put the Plan into effect, why the Debtor believes the Plan is feasible,
- How the treatment of your Claim under the Plan compares to what you would receive on your Claim in a bankruptcy liquidation,
- Who can vote on or object to the Plan.
- What factors the Bankruptcy Court will consider when deciding whether to confirm the Plan.
- The effect of confirmation of the Plan.

**B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan and circulation of the Plan to you should not be deemed tantamount to the Court's approval of the Plan. This section describes the procedures under which the Plan will or will not be confirmed. These procedures are described in more detail by Court Order, and you should consult that Order for a definitive statement of the procedures to be followed.

**1. Time and Place of the Hearing to Confirm the Plan**

The Court will consider confirmation of the Plan on **July 29, 2020 at 1:00 p.m. Central Time** at the United States Bankruptcy Court conducted at the Buchanan County Courthouse, 210 5th Avenue NE, Independence, IA 500644

**2. Deadline For Voting to Accept or Reject the Plan**

If you are entitled to vote to accept or reject the Plan, vote on the enclosed Ballot and return the Ballot to the address on the enclosed return envelope via (a) United States mail, first class postage prepaid; (b) overnight delivery; (c) electronic mail submission to rgainer@cutlerfirm.com or (d) hand delivery. **Your Ballot must be received by 4:30 p.m. Central Time on July 24, 2020 or it will not be counted.** See Article X below for a discussion of voting eligibility requirements.

**3. Deadline For Objecting to the Confirmation of the Plan**

Objections to confirmation of the Plan must be filed with the Court and served upon Robert C. Gainer, Cutler Law Firm, P.C., as required under the Bankruptcy Code and Rules **by 4:30 p.m. Central Time on July 24, 2020.**

**4. Identity of Person to Contact for More Information**

If you want additional information about the Plan, you should contact Robert C. Gainer, Cutler Law Firm, P.C., at rgainer@cutlerfirm.com or 515-223-6600, either in writing or by telephone. Mr. Gainer cannot give you legal advice or assist you in determining how to vote on the Plan.

# ARTICLE II - GENERAL PROVISIONS

## A. Definitions and Rules of Construction

**1. Administrative Expense Claim** shall mean a Claim comprising costs or expenses of administration of the Debtor's Estate under Code § 503(b) and arising from the Petition Date to and including the Confirmation Date, including, without limitation, (a) any actual and necessary expenses of preserving the Debtor's Estate, (b) compensation and reimbursement awarded to professionals under Code § 330, and (c) any fees or charges assessed against the Debtor's Estate under Chapter 123 of Title 28 of the United States Code.

**2. Allowed Claim,** as used in reference to a Claim, shall mean any Claim, that (a)(i) was filed on or before the Claims Bar Date, or (ii) was or hereafter is scheduled by the Debtor as both liquidated and neither disputed nor contingent, and (b)(i) is not subject to any objections in the Bankruptcy Court, (ii) is not subject to any requirement for application and approval by the Bankruptcy Court, and (ii) as to which any application or objection has been determined by a Final Order. In no event shall a Claim be deemed Allowed if such Claim has been objected to or is objected to after entry of the Confirmation Order unless or until such Claim has been determined by a Final Order of the Bankruptcy Court. Unless otherwise specified, no Allowed Claim shall include interest on the principal amount of such Claim from and after the Petition Date, late fees, attorneys' fees, court or other costs, or other charges.

## B. Effective Date of Plan

The Effective Date of this Plan is the first day of the month following the date on which the Confirmation Order becomes a Final Order. However, if a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after that date on which no stay of the Confirmation Order is in effect, unless the Confirmation Order has been vacated. It is anticipated that the Effective Date will be September 1, 2020.

## C. Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability or operative effect of any other provision of this Plan.

## D. Binding Effect

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

## E. Captions

The headings contained in this Plan are for convenience of reference only and do not affect the meaning, construction or interpretation of this Plan.

# ARTICLE III - BACKGROUND

## A. Events Leading to the Bankruptcy Case

The Debtor is an Iowa subchapter S Limited Liability Company, owned by Ryan Etten as sole member. Etten purchased the business from IES on October 1, 2011. At the time of purchase, there existed three locations in: Waterloo, Pella, and Ankeny. Since purchase, the Pella location has been closed. Debtor works out of Waterloo and Ankeny, servicing clients throughout the

state. The Debtor's business is performing electrical services, inclusive of installation, service, and routine maintenance. Representative clients on install include big box retailers, state and municipal projects. Service and maintenance clients include consumer/household, commercial entities.

The Debtor hired an internal Controller in the beginning of 2018 to assist in cost controls and servicing governmental tax, and payroll obligations. The representations of the Controller, as relied upon by the business, were that all obligations were being serviced, and any then-existing debts to governmental agencies were being paid. These representations proved to be inaccurate, and the Debtor's obligations to governmental entities, and to employees, were accumulating. This was compounded by experiencing the slowest winter season the business has seen in 2019. The Controller has been terminated, and the Debtor has been working more closely with its outside accountant and business advisor, Small Business Resources. In an effort to streamline operations, the Debtor was advised it needed to cut overhead. The Debtor terminated ten employees in late 2019 & early 2020, resulting in reduction in monthly overhead by at least $30,000.00. This has not had a material impact on net revenues.

At the same time, in early 2020, the Debtor's primary lender, Community State Bank's note came up for renewal. The proposed new payment on outstanding obligations would not permit the Debtor to cashflow and meet obligations to suppliers and other creditors. As a result of the non-renewal, Community State Bank filed a replevin action and recovery on the note in Black Hawk County on February 25, 2020. With all of these problems, the tax burden was so substantial for a small business thereby giving Debtor the option of either filing a Chapter 11 case in an effort to reorganize or liquidating. Debtor has chosen the former option, and filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on March 25, 2020. Given the relief bankruptcy has provided, and an opportunity to reorganize payments and work through outstanding issues, Debtor believes it is now in a position to pay its current and on-going tax obligations and to fund, through a plan, its delinquent taxes, among its other obligations.

**B. Significant Events During the Bankruptcy Case**

During the Case, the Debtor has managed its financial affairs and taken steps to place itself in a position where it can seek to confirm this Chapter 11 Plan. There also have been a number of significant events during the Debtor's bankruptcy case. In the

first days of their case, the Debtor's counsel changed from previous counsel, to the Court approving the undersigned, Robert C. Gainer, of Cutler Law Firm, P.C., as its attorney. The Debtor attended its initial debtor interview, prepared and filed the Schedules, and attended its meeting of Creditors. The Debtor has engaged in good faith negotiations with secured creditors, including Community State Bank and the Internal Revenue Service, surrounding a proposed stipulated adequate protection order(s), and reached same with Community State Bank. The Debtor has filed reports with the United States Trustee, and provided documentation establishing appropriate post-petition insurance, and debtor in possession account. The Debtor has worked with the Subchapter V appointed Trustee, Douglas Flugum, to address pre-petition transfers and questions post-petition. The Debtor has further worked with taxing authorities to arrive at a consensual repayment of pre-petition priority and secured claims, which will permit a distribution to unsecured creditors through this proposed Plan. The Plan is the culmination of this effort.

## C. Avoidable Transfers

Any potential claims arising under sections 547, 548 and 549 of the Bankruptcy Code are: assigned to the Subchapter V Trustee to pursue, if any are believed to be in existence.

## D. Claims and Claims Objections

Except to the extent that a Claim is already allowed pursuant to a Final Order, the Debtor reserves the right to object to Claims. Therefore, even if your Claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your Claim later is upheld. The procedures for resolving Disputed Claims are stated in Article VI of the Plan.

The final numbers for Allowed Claims will depend upon a number of factors, including the Claims adjudication process. It is not believed that the allowance or disallowance of any claims yet to be resolved will have a material impact on the size of the Creditor body or any amounts available for distribution to Allowed General Unsecured Creditors.

## E. Current and Historical Financial Conditions

The identity and fair market value of the Estate's assets as of the Petition Date and in a hypothetical Chapter 7 liquidation are listed in **Exhibit A**. All values were based upon the Debtor's best estimates after reasonable investigation and evaluation.  Creditors should note that asset values listed as of the Petition Date were based upon the Schedules filed by the Debtor at the inception of its Chapter 11 case.  The Debtor believes that the analysis in Exhibit A provides an estimate of the most that Creditors conceivably could receive after liquidation in Chapter 7. Creditors should keep in mind that liquidation in Chapter 7 would involve fees, expenses and costs that will not have to be paid under this Plan including, without limitation, (a) sales commissions on assets, estimated to be approximately ten percent of any gross sales price, (b) fees for a Chapter 7 Trustee as described in Code § 326, (c) fees for a Chapter 7 Trustee's attorney and other professionals, and (d) taxes on any capital gains.  The Debtor's best estimates is that there would be no dividend for unsecured creditors in a Chapter 7 case, given the security interests of: Ally Bank, Americredit Financial, the Department of Treasury-Internal Revenue Service, and Community State Bank, and the assets available.

The Debtor has filed initial financial statements & periodic monthly operating reports (hereafter, MORs) during the pendency of its Chapter 11 case. The MORs are available via the Bankruptcy Court's ECF system. In reviewing those reports, creditors should note that they do not reflect Chapter 7 expenses or other items as described above.  A pro forma projection of Plan payments anticipated to be made by Debtor is attached hereto as **Exhibit B**.  Important assumptions made to support the projected revenues, billing, and cash receivable include the following:

(i)  Expected Monthly Billings- averaging out 2019 billings, given streamlined efforts of Debtor, movement away from material intensive projects focusing on staffing.

(ii)  Expected Cash Receivables- averaging out receivables for 2020 YTD produces an average monthly cash receivable of $215,143.83.  Debtor is conservatively forecasting receivables at or greater than $200,000.00/month, and this receivable- and likely more- is supported by on-going billings and job schedule.

(iii) Operating Expenses- averaging out expenses monthly, taking into consideration those months with five pay periods.  Expenses should remain constant, even with increased billings, as material costs will remain at reduced levels and staffing should remain the same, given efficiencies that are built-in to the projects being bid for future revenues

**F. Valuation of Membership Units**

In view of the limited value of the Estate's assets and the amount of Debtor's debt, there appears to be no or limited value to the ownership interests of Debtor.

**ARTICLE IV - THE PLAN OF REORGANIZATIONAND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

**A. Purpose of the Plan of Reorganization**

As required by the Code, the Plan places Allowed Claims and equity interests in various Classes and describes the treatment each Class will receive. The Plan also states whether each Class of Claims or equity interests is Impaired a. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**B. Explanation of Classes of Claims and Equity Interests**

**1. Classes of Secured Claims**

Allowed Secured Claims are Claims secured by Estate Property to the extent Allowed as Secured Claims under Code § 506. If the value of the collateral securing Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency may be classified as Unsecured Claim.

**2. Classes of Priority Unsecured Claims**

Certain Claims that are referred to in Code § 507(a) are required to be placed in Classes. In this case, Priority Tax Claims and obligations to individuals on account of contributions to an employee benefit plan fall into this category. These Claims are required to be paid on a particular schedule under the Code.

**3. Classes of Unsecured Claims**

Unsecured Claims are not secured by Estate Property and are not entitled to priority under Code § 507(a).

**4. Class of Equity Interest Holders**

Equity interest holders are parties who hold an ownership interest, i.e., equity interest, in the Debtor. Ryan Etten is the sole member unit holder, owning 100% of the Debtor.

**C. Overview - Treatment of Unclassified and Classified Claims under the Plan**

Allowed Unclassified and Classified Claims will be treated as follows under this Plan:

| Class | Constituency | Impairment | Estimated Distribution | Treatment |
|-------|-------------|------------|----------------------|-----------|
| Unclassified | § 507(a)(2) – Administrative Expense Claims | Not Impaired | $55,000 | Paid in full on the Effective Date of the Plan, or such date as approved by the Court, unless creditor agrees to different/less favorable treatment. |
| Unclassified | § 507(a)(8) Priority Tax Claims of IDR | Not Impaired | $115,170.93 | Payment in full over time substantially in compliance with Bankruptcy Code section 1129(a)(9)(C). |

| | | | | |
|---|---|---|---|---|
| Unclassified | § 507(a)(8) Priority Tax Claims of DOT-IRS | Not Impaired | $469,269.56 | Payment in full over time substantially in compliance with Bankruptcy Code section 1129(a)(9)(C). |
| Class 1 | § 507(a)(1), (4), (5), (6) & (7) – Priority Non-Tax Claims | Not Impaired | $38,868.25 | Payment in full over time substantially in compliance with Bankruptcy Code section 1129(a)(9)(B). |
| Class 2 | Allowed Secured Tax Claim of the IRS | Impaired | $317,227.09 | Paid in full, with interest at 4.25% per annum, within five years of the Petition date, balloon payment on March 24, 2025 |
| Class 3 | Allowed Secured Claim: Community State Bank | Impaired | $304,786.83 | Paid in full, with interest at 4.25% per annum, quarterly payments, within five years of the Petition date, balloon payment on March 24, 2025. |
| Class 4 | Allowed Secured Claim: Americredit Financial | Impaired | $69,312.92 | Paid pursuant to contract and Court Order |
| Class 5 | Allowed Secured Claim: Ally Bank | Not Impaired | $95,848.75 | Paid pursuant to contract |
| Class 6 | Allowed General Unsecured Claims | Impaired | $1,145,954.40 | Each Claim holder to receive a dividend, in Cash, in deferred bi-annual payments, with the first payment being January 15, 2021, and then July 15, 2021, and every six months thereafter through March 24, 2025, of its pro-rata share of the projected disposable income of Debtor, after satisfaction of unclassified claims and Classes 1-5 |
| Class 7 | Equity Interests | Not Impaired | $0 | Equity Interest Retained by Ryan Etten |

**D. Treatment of Unclassified Claims**

Certain types of Claims automatically are entitled to specific treatment under the Code. They are not considered Impaired. Holders of these Claims do not vote on the Plan but may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  Accordingly, the Debtor has not placed the following Claims in any Class:

**1. Administrative Expenses**

Administrative Expense Claims are costs or expenses of administering the Debtor's Chapter 11 case that are allowed under Code § 507(a)(2). The Debtor estimates that Administrative Expenses in the Case will consist of (i) professional fees of $20,000 to $25,000 (net of any retainer), (ii) Trustee fees of $10,000 to $15,000.00, (iii) §503(b)(9) claims at between $10,000 to $20,000, and (iv) any unpaid post-petition expenses associated with the Debtor's Case. It is anticipated the Debtor will pay certain of the approved fees from the funds available in the DIP account.

**a. Plan Treatment**
Administrative Expense Claims will be paid in full upon the Effective Date to the extent such Claims are Allowed Administrative Expense Claims on that date, except for those Claimants who elect to receive different treatment. Administrative Expense Claims that are not Allowed Administrative Expense Claims as of the Effective Date will be paid on or before thirty days after they are Allowed, unless deferred payment arrangements have been made. In the event that an Administrative Expense Claim is a Disputed Claim on the Effective Date, sufficient funds shall be reserved by Debtor to pay such Administrative Expense Claim in full upon its allowance, unless deferred payment arrangements have been made.

**b. Administrative Claims Bar Date**
Any Claimants or Creditors seeking an Allowed Administrative Expense Claim, other than professionals employed in this case pursuant to order of the Bankruptcy Court, were to have filed its claim on or before June 3, 2020.

**c. United States Trustee Fees**
Subchapter V bankruptcy cases do not require the payment of quarterly fees to the United States Trustee, as ordinarily required under 28 U.S.C. § 1930(a)(6)(A). As such, there will be no quarterly payments, or any payments whatsoever, to the United States Trustee.

**2. Unsecured Priority Tax Claims**
Unsecured Priority Tax Claims are Claims for unsecured income, employment, and other taxes described by Code § 507(a)(8). Unless the holder of such an Unsecured Priority Tax Claim agrees otherwise, it must receive the present value of its Claim, in regular installments paid over a period not exceeding five years from the Petition Date. Any event of default shall be governed by Article XI.

**i. The Iowa Department of Revenue Priority Claim**
The Iowa Department of Revenue holds an Allowed Unsecured Priority Tax Claim in the amount of $115,170.93. This shall be paid monthly, amortized over 5 years at 7%, with a 5 year balloon payment on March 25, 2025. This would produce a monthly payment of: $2,280.52, beginning on August 19, 2020, and monthly thereafter.

**ii. The Department of Treasury – Internal Revenue Service Priority Claim**
The Department of Treasury – Internal Revenue Service holds an Allowed Unsecured Priority Tax Claim in the amount of $469,269.56, amortized over 5 years at 5%, with a 10 year balloon, for the first 12 months, with first payment beginning on August 19, 2020; thereafter, monthly payment of $8,216.35 for remaining term of Plan, with a balloon payment on March 24, 2025.

**D. Treatment of Classified Claims.**

All Allowed Claims other than Allowed Claims specified in Code § 507(a) are placed in the Classes listed below. All of the below Claims are Impaired.

**1. Class 1: Priority Claims.**

Any Allowed Claim entitled to priority under Code § 507 other than Administrative Expense Claims and Unsecured Priority Tax Claims is limited to the obligation owed on account of § 507(a)(5) claims. These will be paid the full amount of such Allowed Claim as listed on the Amended Schedules on or before the first anniversary of the Effective Date in full satisfaction of its Claim, funded 1/12 of such claim each month beginning August 19, 2020, without interest. As scheduled, Debtor believes there to be $38,868.25 in Allowed Claim, providing a monthly Plan payment of $3,239.02. Any event of default shall be governed by Article XI.

**2. Class 2: Secured Claim of the Department of Treasury – Internal Revenue Service.** The allowed secured claim of the Class 2 Creditor is $317,227.09, and shall be satisfied and paid as follows:

    **(a)** Debtor will make monthly payments of $2,386.43, the first payment of which is due August 19, 2020. This represents payment on the allowed secured claim at 4.25% interest, on a 15 year amortization schedule. The term shall be a five year balloon, with the balloon payment due March 24, 2025. All payments shall be applied to the oldest unpaid tax year, and then, when paid, to the next successive oldest tax year, until all of the Allowed Secured Claim and the Allowed Unsecured Priority Tax Claim is paid in full as provided herein. Debtor shall have the right to pre-pay all or any portion of this Allowed Secured Claim without penalty. Department of Treasury – Internal Revenue Service will retain its first priority lien on and security interest in the Debtor's accounts receivable, inventory, and equipment, subject to any administrative fees and expenses approved by the Court. Any event of default shall be governed by Article XI. The holder of this claim, Department of Treasury – Internal Revenue Service, is impaired.

**3. Class 3: Secured Claim of Community State Bank.** The allowed secured claim of the Class 3 creditor is $304,786.83, and shall be satisfied and paid as follows:

    **(a)** Debtors will make monthly payments of $2,292.85, the first payment of which is due August 19, 2020. This represents payment on the allowed secured claim at 4.25% interest, on a 15 year amortization schedule. The term shall be a five year balloon, with the balloon payment due March 24, 2025. Community State Bank will retain its first priority lien on and security interest in the Debtor's accounts receivable, inventory, and equipment, subject and subordinate to the allowed secured Class 2 creditor Department of Treasury - Internal Revenue Service, and any administrative fees and expenses approved by the Court. CSB must file a claim for any deficiency to the extent it wishes to participate in the unsecured dividend. Any event of default shall be governed by Article XI. The holder of this claim, Community State Bank, is impaired.

**4. Class 4: Secured Claim of AmeriCredit Financial Services dba GM Financial.** The allowed secured claim of Class 4 creditor totals $69,312.92, as reflected at Proofs of Claim ## 4 & 5 on account of two (2) 2019 Silverado vehicles. The obligations on these vehicles will be paid pursuant to the contracts in existence, and the stipulated Court Orders on Relief from Stay at Docket ##68 & 69, and the creditors will retain its lien until payment in full, at which time it will release its claim of record. Relative to any deficiency it may have surrounding Proof of Claim

#6, AmeriCredit Financial Services must file a deficiency claim to the extent it wishes to participate in the unsecured dividend. Any event of default shall be governed by Article XI. The Class 4 creditor is impaired.

**5. Class 5: Secured Claim of Ally Bank.** The allowed secured claim of Class 5 creditor totals $95,848.75, as reflected at Proofs of Claim ## 15,16,17, & 18, on account of four (4) vehicles: 2019 & 2018 Chevy Express, 2019 Silverado, and 2018 Malibu. The obligations on these vehicles will be paid pursuant to the contracts in existence, and the creditors will retain its lien until payment in full, at which time it will release its claim of record. Any event of default shall be governed by Article XI. The Class 5 creditor is unimpaired.

**6. Class 6: General Unsecured Creditors.** Debtor shall agree to pay to or for the benefit of Unsecured Creditors the projected disposable income of the Debtor over the life of the Plan, after satisfaction of unclassified claims Classes 1-5, bi-annual payments, with the first payment being January 15, 2021, and then July 15, 2021, and every six months thereafter through March 24, 2025. Each Class 6 creditor to take a pro-rata share, on account of its claim against the Class. The Debtor commits to a minimum repayment of 11% of Allowed Unsecured Claims over the life of the Plan. The payment of Allowed Unsecured Claims shall only be paid if Debtor is current on its payments on the Allowed Secured Claims and on Allowed Priority Claims and Allowed Unsecured Priority Tax Claims. If such Claim payments are not current, then the bi-annual payments of the Allowed Unsecured Claims shall be commenced on the next scheduled bi-annual date, as defined above, after such Secured and priority payments become current. Any event of default shall be governed by Article XI.

**7. Class 7: Equity Interests in the Debtor**
Ryan Etten will retain 100% member unit interest subject to performance under this Plan. The success of this Plan is driven by the efforts of Mr. Etten at obtaining new business in line with margins to support on-going operations and Plan payments. Both Mr. Etten, and his wife, Carrie Etten, are employees of the Debtor. Mr. Etten serves in various roles of the company, including sales, bidding, strategy, and some field work. Prior to the Petition for Relief, his salary was $150,000.00 per year. This salary will be reduced to $135,000/year, and provided that all Plan payments are being made through June 30, 2021, he shall be entitled to a return to his prior year salary, and cost of living raises thereafter. Mrs. Etten performs billing and bookkeeping functions for the Debtor. Prior to the Petition for Relief, her salary was $44,000.00. Her salary will be reduced to $40,000/year, and provided that all Plan payments are being made through June 30, 2021, she shall be entitled to a return to her prior year salary, and cost of living raises thereafter.

## ARTICLE V – DISTRIBUTIONS

**A. Distributions.**
All Creditors to be paid under this Plan will be paid by the Debtor as described in this Plan. Cash distributions shall be in United States funds, by check drawn on a domestic bank or if the Debtor so elects in its sole discretion for distributions to certain large Claimants, by wire transfer from a domestic bank. No distribution shall be made to any Claimant where the distribution payment is less than $10.
Checks issued by the Debtor with respect to Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any check must be

made directly to the Debtor or its Counsel by the holder of the Allowed Claim with respect to which the check originally was issued. Any Claim in respect of such a null and voided check shall be made on or before ninety (90) days after the date of issuance of the check, after which time all Claims in respect of such null and voided checks shall be forever barred.

## B. Creditor Addresses.

Cash distributions by check shall be mailed to Creditors at the addresses set forth on the Creditors' Proofs of Claim, or, if no Proof of Claim was filed, shall be mailed to the Creditor's last known address contained in the Schedules. If any Creditor's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.

# ARTICLE VI - ALLOWANCE AND DISALLOWANCE OF CLAIMS

## A. Disputed Claims

A Disputed Claim is a Claim that has not been Allowed or disallowed by Final Order of the Bankruptcy Court, and as to which either: (i) a Proof of Claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no Proof of Claim has been filed, and the Debtor scheduled such Claim as disputed, contingent, or liquidated. No distribution will be made on account of a Disputed Claim unless and until such Claim is allowed by Final Order of the Bankruptcy Court.

## B. Settlement of Disputed Claims

The Debtor will have the power and authority to settle and compromise disputed Claims with Court approval and compliance with Bankruptcy Rule 9019.

## C. Deadline for Objections to Claims

Except as agreed otherwise by the Debtor and any Claimant in writing, all objections to Claims by the Debtor or any other party must be filed on or before 30 days after the Effective Date provided, however, that this deadline shall not preclude any settlements by the Debtor of any adversary proceeding that result in any modification to a Claim after that deadline.

# ARTICLE VII - PROVISIONS ON EXECUTORY CONTRACTS/UNEXPIRED LEASES

## A. Assumed Executory Contracts and Unexpired Leases

The Debtor assumes the following executory contracts and/or unexpired leases effective upon the Effective Date: **None. All executory contracts or unexpired leases as provided in the Debtor's Schedule "G" are rejected.**

## B. Rejected Executory Contracts and Unexpired Leases

The Debtor conclusively will be deemed to have rejected all executory contracts and unexpired leases that (a) are not expressly assumed under this Article of the Plan or (b) were not assumed under a separate motion before the Effective Date of this Plan. A Proof of Claim arising from the rejection of an executory contract or unexpired lease under this Article of the Plan must be filed no later than thirty (30) days after the Effective Date. Any Claim based on the rejection of a contract or lease will be barred if the Proof of Claim is not timely filed.

## ARTICLE VIII - MEANS OF IMPLEMENTING THE PLAN

**A. Source of Payments**

Payments and distributions under the Plan will be funded by the Debtor's operations and more fully described in Articles IV and V above, and Exhibit B. The Debtor's payments will come from the Debtor's earnings. Based upon the Debtor's average net monthly income as reported in the Debtor's MORs and its financial information provided herein, there should be sufficient funds for the Debtor to make all payments under the Plan. Monthly receivable for 2020 has averaged $215,143.88 since the changes put into place by management have become effective. These changes included eliminating significant overhead in employees, job selection, and focusing on staffing as opposed to margins-on material. .

**B. Risk Factors**

The primary risks under the Plan are that the market could soften for new electrical installation, Debtor could cease to exist, encounter business setbacks due to overall economic conditions, or have poor results such that earnings are reduced significantly.

## ARTICLE IX – CERTAIN FEDERAL INCOME TAX INFORMATION AND CONSEQUENCES

The Debtors will not seek a ruling from the Internal Revenue Service prior to the Effective Date with respect to any of the tax aspects of the Plan.

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtors. The Plan Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the tax code embodies many complicated rules which make it difficult to completely and accurately state all of the tax implications of any action or transaction.

1. Tax Impact on the Debtor

Debtor is an Iowa Company having elected Sub-Chapter "S" taxation status, filing an 1120S. Debtors derive their income from the sale, installation, and repair of electrical components. The Plan does not anticipate the Debtor making any significant asset sales or disposition of it's ongoing business operation, but does reserve such right to the Debtor, if in the reasonable business judgment of the Debtor and secured party, such sale can effectuate a more efficacious rehabilitation.

2. Tax Impact on Creditors

The Debtors are unaware of any adverse tax consequences of the Plan to Creditors or Interest Holders. It is not necessary or practical to present a detailed explanation of the federal income tax aspects of the Plan or the related bankruptcy tax matters involved in this Chapter 11 case. The tax consequences resulting from the Plan to each individual Creditor should not vary significantly from the past tax consequences realized by each individual Creditor. To the extent that the tax consequences do vary for individual Creditors, each one is urged to seek advice from his/her/its own counsel or tax advisor with respect to the federal income tax consequences resulting from confirmation of the Plan. Jonathan Hart and Ashley Hart will comply with all applicable reporting requirements of the Internal Revenue Code of 1986, as amended.

Creditors may realize taxable income if they receive payments from the Debtors' Plan and they are on the tax basis of accounting for tax return purposes. Furthermore, Creditors may incur taxable income if they receive payments from this plan and they have written off the accounts receivable balance.

ANY PERSON CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN IS STRONGLY URGED TO CONSULT WITH HIS/HER/ITS OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS TO DETERMINE HOW THE PLAN MAY AFFECT HIS/HER/ITS FEDERAL, STATE, LOCAL AND FOREIGN TAX LIABILITY.

## ARTICLE X - CONFIRMATION REQUIREMENTS AND PROCEDURES

### A. Overview of Requirements

To be confirmable, the Plan must meet the requirements listed in Code §1191, incorporating § 1129. These include the requirements that (1) the Plan must be proposed in good faith; (2) that the Plan be fair and equitable, in line with the projected disposable income of the Debtor; (3) the Plan must distribute to each Creditor and equity interest holder at least as much as the Creditor or equity interest holder would receive in a Chapter 7 liquidation case, unless the Creditor or equity interest holder votes to accept the Plan; and (4) the Plan must be feasible, and there is a reasonable likelihood of the Debtor being able to make all payments called for in the Plan. These requirements are not the only requirements listed in Code §1191, and they are not the only requirements for confirmation.

### B. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met. Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A Creditor or equity interest holder has a right to vote for or against the Plan only if that Creditor or equity interest holder has a Claim or equity interest that is both (1) Allowed or Allowed for voting purposes as of the date of any confirmation hearing and (2) Impaired.

### C. What Is an Impaired Claim or Impaired Equity Interest

As noted above, the holder of an Allowed Claim or equity interest has the right to vote only if it is in a Class that is Impaired under the Plan. As provided in Code § 1124, a Class is considered Impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

### D. Who is Not Entitled to Vote

The following types of Creditors and equity interest holders are not entitled to vote:
1. Holders of Claims and equity interests that have been disallowed by an order of the Court.
2. Holders of other Claims or equity interests that are not "Allowed Claims" or "Allowed equity interests".
3. Holders of Claims or equity interests in unimpaired Classes.
4. Holders of Claims entitled to priority pursuant to Code §§ 507(a)(2), (a)(3), and (a)(8).
5. Holders of Claims or equity interests in Classes that do not receive or retain any value under the Plan.
6. Holders of Administrative Expense Claims.
Even if you are not entitled to vote on the Plan, you have a right to object to the confirmation of the Plan.

**F. Who Can Vote in More Than One Class**

A Creditor whose Claim has been allowed in part as a Secured Claim and in part as an Unsecured Claim, or who otherwise hold Claims in multiple Classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each Claim.

**G. Votes Necessary to Confirm the Plan**

If Impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one Impaired Class of Creditors has accepted the Plan without counting the votes of any insiders within that Class, and (2) all Impaired Classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting Classes under Code §1191(b).

**1. Votes Necessary for a Class to Accept the Plan**

A Class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half of the allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds in dollar amount of the allowed Claims in the Class, who vote, cast their votes to accept the Plan. A Class of equity interests accepts the Plan if the holders of at least two-thirds in amount of the allowed equity interests in the Class, who vote, cast their votes to accept the Plan.

**2. Treatment of Non-accepting Classes**

Even if one or more Impaired Classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner prescribed by Code § 1191. A plan that binds non-accepting Classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind non-accepting Classes of Claims or equity interests if it meets all the requirements for consensual confirmation except the  requirements of Code § 1129(a)(8), (10) and (15),does not "discriminate unfairly," and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan. The Debtor reserves its right to request the Bankruptcy Court to confirm the Plan pursuant to Code § 1191(b) and to automatically cause such modification of the Plan as is necessary to enable the Plan to provide treatment of Claims to satisfy the requirements of Code § 1191(b). You should consult your own attorney if a "cramdown" confirmation will affect your Claim or equity interest, as the variations on this general rule are numerous and complex.

**H. Liquidation Analysis**

To confirm the Plan, the Court must find that all Creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such Claim and equity interest holders would receive in a Chapter 7 liquidation.

A liquidation analysis is included in <u>Exhibit A</u> to the Plan.  Unsecured Creditors would not receive any recovery given the secured claims of creditors:  Internal Revenue Service, Community State Bank, AmeriCredit dba GM Financial, and Ally Bank.

**I. Ability to Fund Plan and Operate without Further Reorganization**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that its has enough cash on hand to pay all the Claims and expenses that are entitled to be paid on or within ninety (90) days of the Effective Date. This should be sufficient to pay Allowed Administrative Expenses or as by separate agreement of the Allowed Administrative Expense holder. The Debtor also must show that it will have enough cash over the life of the Plan to make the required Plan payments. The monthly payments under the Plan will be paid by the Debtor's income. Please see <u>Exhibit B</u>. You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.

## ARTICLE XI- EVENTS OF DEFAULT

**A. Events of Default**. The occurrence of any of the following shall constitute an event of default by the Debtor under the Plan:

1. Failure on the part of the Debtor to pay fully when due any payment required to be under the Plan.

2. Failure on the part of Debtor to perform or observe: (i) any term of provisions set forth in Article IV which fairly remains uncured for a period of twenty days; or (ii) any other term or provision of the Plan other than those set forth in sub-paragraph (1) above, which failure remains uncured for a period of twenty days.

**B. Notice of Default**.

1. For all creditors except: (i) the Department of Treasury - Internal Revenue Service & (ii) Iowa Department of Revenue: If an event of default by the Debtor occurs and such default is not cured within twenty days after a notice of default is served upon the Debtor and it's counsel in the manner prescribed in this Plan, creditor shall be authorized to file an affidavit of failure to cure default with the Bankruptcy Court and the stay shall lift automatically. If Debtors timely cures the default, the Debtors shall continue to perform it's obligations under the Plan.

2. For creditors (i) the Department of Treasury - Internal Revenue Service & (ii) Iowa Department of Revenue: Upon the failure of the debtor to make any payment due on a secured or priority tax claim, or failure to file the necessary tax returns and make adequate deposits, which is not cured within thirty (30) days of the mailing of a written notice of default by the aforementioned creditors, such creditor may exercise all rights and remedies available under non-bankruptcy laws for the collection of its entire claim and/or seek appropriate relief from this Court. If Debtors timely cures the default, the Debtors shall continue to perform it's obligations under the Plan..

3. In the event of a conversion of this case to a Chapter 7 proceeding, all property of the debtor, debtor-in-possession or reorganized debtor, including property which will revest in the reorganized debtor pursuant to confirmation of the plan of reorganization and all property acquired by the reorganized debtor subsequent to a plan of confirmation, shall be property of the Chapter 7 estate.

## ARTICLE XII - EFFECT OF CONFIRMATION OF PLAN

**A. Binding Effect of Plan.**

On and after the Confirmation Date, the provisions of the Plan shall bind Debtor, the Reorganized Debtor, and all Creditors (whether they have accepted the Plan or not) and the respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing.

**B. Operation of Confirmation Order**

Pursuant to Code § 1142(b), the Confirmation Order shall operate as an order of the Court directing the Debtor, the Reorganized Debtor, and any other necessary parties, to execute and deliver, or join in the execution and delivery of any instrument required to effect a transfer of the Estate Property, and to perform any other act that is necessary for the consummation of this Plan. The confirmation of the Plan does not determine the validity, extent, or priority of any party's alleged liens on property of the Debtor. Validity, extent or priority of said liens must be adjudicated by separate order of a court.

**C. Discharge**

1. From and after the Effective Date, all Creditors or other individuals or entities who have held, hold, or may hold Claims against or interests in the Debtor shall be permanently enjoined from taking in connection with matters related to the Debtor or this cases any of the following actions against the Debtor, or any of its property on account of such Claims or interests: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor; or (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall relieve Debtor or other parties in interest from performing their obligations as set forth in this Plan, the plan documents or any related documents contemplated herein.

**D. Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan in line with the requirements of Code §1193.

**E. Retention of Jurisdiction**

This Court shall further retain jurisdiction to hear and determine any controversy pending as of the date of confirmation before this Court and for the purpose of granting any injunction or other relief (including damage awards) as may be necessary or desirable to effectuate the purpose of the Plan of Reorganization.

The Court shall further retain jurisdiction to compel by injunction if necessary any creditor who has a filed lien of record whose secured claim has been paid in full, or not allowed to release its secured liens of record.

The Court shall further retain jurisdiction to enter orders allowing compensation to persons so entitled to receive compensation pursuant to the Bankruptcy Code, and to hear and determine all controversies relating to the obligations of the debtor incurred and the conduct of the debtor's business prior to confirmation. Post confirmation compensation for services rendered by a Professional employed by the Debtor after the confirmation date for reimbursement of expenses incurred in connection with the Plan need not be approved by the Court. Professionals may invoice the Debtor directly, and debtor may pay such amounts directly without Court approval. Such post-confirmation compensation shall be viewed as ordinary expense of the Debtor.

**F. Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor shall file a motion with the Court to obtain a final decree to close the case. Debtor shall immediately, upon confirmation, apply for a final decree.

**ARTICLE XIII – REQUEST FOR CONFIRMATION**

To the extent deemed necessary, the Debtor hereby requests that the Court enter an order confirming the Plan.

Dated:  June 23, 2020                    BY        */s/ Ryan Etten*_____

                                                             Ryan Etten, President
                                                             Ryan's Electrical Services, LLC.

                                                             RESPECTFULLY SUBMITTED,

                                                             */s/ Robert C. Gainer*_____
                                                             Robert C. Gainer        AT0000305
                                                             CUTLER LAW FIRM, P.C.
                                                             1307 50th Street
                                                             West Des Moines, IA 50266
                                                             Tel:  515-223-6600
                                                             Fax: 515-223-6787
                                                             Email:  rgainer@cutlerfirm.com
                                                             ATTORNEY FOR DEBTOR

**Ryan's Electrical Services, LLC.**
**Bankruptcy 20-00411**
**Exhibit A - Liquidation Analysis**

| Sch A/B | Description | Value | Liq Cost | * | Secured Claim Amt. | Secured Creditor | $ Avail Unsec'd |
|---|---|---|---|---|---|---|---|
| 3.1 | Community State Bank account | $ - | | | | | $ - |
| 3.2 | US Bank checking account | $ 30,408 | | | $ 30,408 | CSB/IRS | $ - |
| 11a | Accounts receivable - 90 days old or less | $ 423,942 | | | $ 423,942 | CSB/IRS | $ - |
| 11b | Accounts receivable - over 90 days old | $ 112,962 | | | $ 112,962 | CSB/IRS | $ - |
| 19 | Inventory - raw materials | $ 169,942 | | | | CSB/IRS | $ - |
| 39 | Office furniture | $ 108,040 | | | | CSB | $ - |
| 47.1 | 2018 Chevy Express | Below what is owed | | | $ 23,940 | Ally Financial | $ - |
| 47.2 | 2019 Chevy Express | Below what is owed | | | $ 18,761 | Ally Financial | $ - |
| 47.3 | 2019 Chevy Malibu | Below what is owed | | | $ 18,761 | Ally Financial | $ - |
| 47.4 | 2019 Chevy Silverado | Below what is owed | | | $ 27,416 | Ally Financial | $ - |
| 47.5 | 2018 Silverado | Below what is owed | | | $ 26,384 | GM Financial | $ - |
| 47.6 | 2018 Silverado | Below what is owed | | | $ 32,883 | GM Financial | $ - |
| 47.7 | 2018 Chevy Malibu | Retruned to Creditor- deficiency | | | $ 15,984 | GM Financial | $ - |
| 47.8 | VIN ending vechicles (196 & 050) | $ 25,800 | | | $ 25,800 | CSB/IRS | $ - |
| 47.9 | VIN ending vechicles (256, 232, 321, 435, 457, 718, 107, 305, 204, 309, 102) | $ 26,194 | | | | CSB/IRS | $ - |
| 47.1 | Trailers (6) | $ 6,000 | | | | CSB/IRS | $ - |
| 50 | Scissor lifts (3) | $ 15,000 | | | | CSB/IRS | $ - |
| 50 | Handtools | $ 7,500 | | | | CSB/IRS | $ - |
| 77 | Loan to shareholder Ryan Etten | $ 143,107 | | | | CSB/IRS | $ - |
| | | | | | | SUB-TOTAL | $ - |

| | | | |
|---|---|---|---|
| | | SUB-TOTAL | $ - |
| Ch. 7 Trustee Fees | | | |
| $0 to $5,000 - 25%: | | | |
| >$5,000 <$50,000 - 10%: | | | |
| >$50,000 < $1mm - 5%: | | | |
| >$1,000,000 -- 3% | | | |
| Ch. 7 Trustee Fees | | TOTAL | $ - |

| | |
|---|---|
| Dividend to Unsecured Creditors in Ch 7^ | 0% |
| (^) Deficiency claims & POC's | $ 1,703,288 |
| Projected dividend to Unsecured Creditors in Ch 11^ over life of Plan | 11% |

Name: **Ryan's Electrical Services, LLC**
Case No: **20-00411**

**EXHIBIT B**
**CASHFLOW PROJECTION**

| | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Expected Monthly Billings | $298,448.58 | 210,118.11 | 250000 | 300000 | 300000 | 300000 | 300000 | 300000 | 250000 | 250000 | 225000 | 225000 | 250000 | 200000 | 250000 | 300000 | 350000 | 350000 |
| Expected Cash Receivable | $150,259.43 | 329,588.57 | 198000 | 200000 | 200000 | 210000 | 215143.83 | 210000 | 210000 | 215143.83 | 200000 | 215143.83 | 215143.83 | 210000 | 210000 | 215143.83 | 210000 | 210000 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | | | |
| MATERIAL PURCHASES | 28,498.63 | 136,142.11 | 10295.98 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 |
| LICENSES & PERMITS | 0.00 | 474.15 | 186.35 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| WAGES/SALARIES | 102,326.50 | 125,629.90 | 98,408.78 | 125,629.90 | 99,402.80 | 98,408.78 | 125,629.90 | 98,408.78 | 98,408.78 | 125,629.90 | 99,402.80 | 99,402.80 | 125,629.90 | 98,408.78 | 98,408.78 | 125,629.90 | 98,408.78 | 98,408.78 |
| PAYROLL EXP | 233.70 | 1,335.55 | 192.5 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| COMMERCIAL/WORK COMP INS | 7,083.00 | 0.00 | 15934 | 7083 | 7083 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 | 8000 |
| EMPLOYEE BENEFITS | 4,243.30 | 6,013.69 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 | 4,243 |
| WELLMARK | 0.00 | 8,204.50 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 | 8204.5 |
| PAYROLL TAXES | 10,500.06 | 12,395.52 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 |
| SALES TAXES | 0.00 | 2,096.67 | 431 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| WITHHOLDING TAXES | 0.00 | | 6,026 | | | 6,026 | | | 6,026 | | | 6,026 | | | 6,026 | | | 6,026 |
| UNEMPLOYMENT TAX | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 | 2,600.00 |
| AUTO & TRUCK EXPENSES | 965.84 | 143.42 | 737.91 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| BANK SERVICE CHARGES | 241.47 | 113.72 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| COMPUTER & INTERNET EXP | 534.58 | 414.82 | 272 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 | 414 |
| DUES & SUBSCRIPTIONS | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 | 304.82 |
| INTEREST EXP | 0.00 | 407.07 | 17.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MEALS & ENTERTAINMENT | 172.00 | 70.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| OFFICE EXPENSES | 902.45 | 580.63 | 705.82 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| PROFESSIONAL DEV & FEES | 5,409.78 | 7,016.01 | | | | | | | | | | | | | | | | |
| RENT EXPENCSE | 7,594.51 | 8,889.77 | 6295.81 | 6295.81 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 | 6000 |
| REPAIRS & MAINTENANCE EXP | 0.00 | 543.56 | 804.77 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TRAVEL EXP | 0.00 | 0.00 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PHONE & UTILITY EXPENSES | 2,600.00 | 5,462.84 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 | 3000 |
| **Total Expenses** | 18,725.45 | 23,946.66 | 12,339.03 | 10,814.63 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 | 10,518.82 |
| **SUBTOTAL OPERATING EXPENSES** | 174,210.64 | 318,838.75 | 170861.12 | 202025.01 | 175502.1 | 181451.08 | 202646.2 | 175425.08 | 181451.08 | 202646.2 | 176419.1 | 182445.1 | 202646.2 | 175425.08 | 181451.08 | 202646.2 | 175425.08 | 181451.08 |
| **Projected Disposable Income** | ($23,951) | $10,750 | $27,139 | ($2,025) | $24,498 | $28,549 | $12,498 | $34,575 | $28,549 | $12,498 | $23,581 | $32,699 | $12,498 | $34,575 | $28,549 | $12,498 | $34,575 | $28,549 |
| **PLAN COMMITMENTS** | | | | | | | | | | | | | | | | | | |
| Admin Claims | | | | | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| Priority Tax Claims | | | | | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 7,257.85 | 10,496.87 | 10,496.87 | 10,496.87 |
| Class 1- Priority Claims | | | | | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | 3239.02 | | | |
| Class 2- IRS | | | | | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 | 2386.43 |
| Class 3- CSB | | | | | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 | 2292.85 |
| Class 4- GM FINANCIAL | | | | | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 1760.43 | 2106.57 | 2106.57 | 2106.57 |
| Class 5- ALLY Bank | | | | | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 | 2080.61 |
| Sub-Total Plan Pmts | | | | | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,017.19 | 21,363.33 | 21,363.33 | 21,363.33 |
| Disposable Income less Plan Pmts | | | | | $3,480.71 | $7,531.73 | ($8,519.56) | $13,557.73 | $7,531.73 | ($8,519.56) | $2,563.71 | $11,681.54 | ($8,519.56) | $13,557.73 | $7,531.73 | ($8,865.70) | $13,211.59 | $7,185.59 |
| Payment to unsecured creditors | | | | | | | | | | $23,582.34 | | | | | | $18,295.59 | | |